UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JOANNE GARZA | ) | CASE NO. 3:14CV6 |
| | ) | |
| Plaintiff | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | **MEMORANDUM AND OPINION** |
| CAROLYN W. COLVIN, | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Joanne Garza Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in her decision in finding that Plaintiff was not disabled because she could perform her past relevant work as a factory worker (Tr. 14-22). The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

## I. PROCEDURAL HISTORY

Plaintiff, Joanne Garza, filed her application for DIB and SSI on September 28, 2010, alleging she became disabled on April 30, 2007 (Tr. 190-202). Plaintiff's application was denied initially and on reconsideration (Tr. 100-101, 128-129). Plaintiff requested a hearing before an ALJ, and, on September 4, 2012, a hearing was held where Plaintiff appeared with counsel and testified before an

1

ALJ, and Mark A. Pinti, a vocational expert (VE), also testified (Tr. 28-73).

On September 18, 2012, the ALJ issued her decision, finding Plaintiff not to be disabled (Tr. 9-27). Plaintiff requested a review before the Appeals Council, and the Appeals Council denied Plaintiff's request for review (Tr. 1-6). Therefore, Plaintiff has requested judicial review of the Commissioner's final decision pursuant to 42 U.S.C. Sections 405(g) and 1383(c)(3).

## II. STATEMENT OF FACTS

At the time of the administrative hearing, Plaintiff was forty-seven years old (Tr. 190). She has a ninth-grade education and past relevant work experience as a factory worker (Tr. 22).

## III. SUMMARY OF MEDICAL EVIDENCE

Plaintiff has seen mental health professionals for mental health issues, beginning treatment in 2010 (Tr. 310). In October 2010, Plaintiff treated twice with Rescue Mental Health Services (Tr. 303-317). Plaintiff reported that she had functioned fairly normally until about three years earlier, and was able to hold good jobs in the past (Tr. 303, 310). When asked to explain the change in her functioning, Plaintiff reported, "I interrupt other people's conversations, I try to say something but then no one wants to listen to me and I get all upset. I tell them that they don't care and I might as well go kill myself because they don't care" (Tr. 303). She also complained of problems with hearing voices (Tr. 303, 310). Plaintiff was diagnosed with depressive disorder, not otherwise specified (NOS), because she did not satisfy the diagnostic criteria of major depressive disorder or dysthymic disorder (Tr. 310). She was also diagnosed with psychotic disorder NOS in order to define her complaints of hearing voices, but she did not meet the criteria of Schizophrenia or Schizoaffective

Disorder (Tr. 310). She was assigned a global assessment of functioning (GAF) score of forty-five, serious symptoms or functioning (Tr. 316).

In December 2010, Plaintiff attended a consultative psychiatric examination by psychologist Mark D. Hammerly, Ph.D. (Tr. 318-325). She said she was applying for disability benefits because of "depression, you know . . . yeah, learning disabilities or something" (Tr. 318). Plaintiff reported that she attended school through ninth grade in regular classrooms (Tr. 319). Dr. Hammerly found this odd, stating, "I can't imagine how this person was 'missed' in school," and noting her borderline intellectual functioning (Tr. 319). When asked about her work history, Plaintiff said she was fired "because I would have bad attendance and would call off and come in late . . . I guess they needed people who really wanted to work, or something!" (Tr. 320). She said she left one job after a year when the company moved out of town (Tr. 320). She reported no problems getting along with people on the job, no problems with work speed, quality, or understanding (Tr. 320). She did report having problems "getting up in the morning and going to work and calling off all the time" (Tr. 320).

When asked about her daily activities, Plaintiff said she lived with friends and did most of the household duties in order to pay for her room and board, including dishes, laundry, cooking, housecleaning, and grocery shopping (Tr. 322). She said her friend paid the bills and kept track of the household money balances, although she had done this herself in the past at some point. Plaintiff reported having a suspended driver's license "because I forgot about appearing in court" (Tr. 322). She also said she was able to use public transportation, and usually took the bus or walked to appointments (Tr. 322).

Dr. Hammerly administered intelligence tests, indicating a verbal comprehension IQ of seventy, perceptual reasoning IQ of seventy-seven, working memory IQ of seventy-four, processing speed IQ of seventy-six, and a full scale IQ of seventy (Tr. 323). He diagnosed her with adjustment

3

disorder with depressed mood and borderline intellectual functioning (Tr. 328). He also assigned a GAF score of fifty-four, which Dr. Hammerly said he based on both moderate symptoms and moderate functional impairment (Tr. 324). Following the examination, Dr. Hammerly opined that Plaintiff had only mild deficits in her ability to understand, remember, and follow instructions; only mild deficits in her ability to maintain attention, concentration, persistence, or pace; and moderate deficits in her ability to withstand the pressures associated with day-to-day work (Tr. 324-325).

Plaintiff also treated with Harbor Behavioral Healthcare, twice in 2010 - November 2010 (Tr. 338-342), December 2010 (Tr. 343-346) - and four times in 2012 - February 2012 (Tr. 409-413), April 2012 (Tr. 425-426, 429), June 2012 (Tr. 423-424), and July 2012 (Tr. 427). At the initial visit in November 2010, Plaintiff reported difficulty with reading and comprehending, nightmares at night, racing thoughts, and impulsive thinking (Tr. 338). She said she was hearing voices whispering to her, telling her to do things, such as jumping in front of a bus (Tr. 338). She also reported mood irritability and fluctuations (Tr. 338). At the next visit in December 2010, Plaintiff said that after a few days of extreme sedation, that her medication was working well to help her feel calm and to converse appropriately (Tr. 343). She was very happy with the medication; she had no more bad dreams, and her depression was better (Tr. 343). The examiner noted that Plaintiff's cognitive functioning appeared to be at baseline (Tr. 344). In 2012, Plaintiff complained of anxiety, depression, irritability, and difficulty getting along with others (Tr. 409). Psychiatrist Jean Molitor, M.D. diagnosed Plaintiff with depressive disorder NOS and post-traumatic stress disorder (Tr. 412-413). Dr. Molitor noted baseline cognitive functioning, and assigned a GAF score of fifty-five, moderate symptoms of functioning (Tr. 413).

4

## **IV.** **SUMMARY OF TESTIMONY**

At the time of the administrative hearing, Plaintiff was forty-seven years (Tr. 50). She testified that she filed an application for disability benefits because her mom told her to file for "bipolar, depression, just arguing with people" (Tr. 40). She said that people had noticed a change in her behavior since 2007 (Tr. 38, 40). She described her symptoms as mad, angry, an attitude, and "just don't want to work" (Tr. 40). Plaintiff said she did not like having bosses, that she had a bad attitude with people, and that she "cuss[ed] people out" (Tr. 41). She described speaking to shadows in her room one week before the hearing (Tr. 50-51).

Plaintiff stopped attending school in ninth grade, testifying that, "I couldn't learn in school. I had two kids at home and my mom watched them while I went to school. And I tried learning and that and just couldn't do it" (Tr. 53). She said she repeated ninth grade twice, and flunked either fourth or fifth grade (Tr. 62). Plaintiff reported that she was never tested for special education (Tr. 62). She was able to pass the test for her driver's license, but was unable to get her GED (Tr. 54-55). Plaintiff reported an ability to read books meant for three- or four-year-olds (Tr. 59). She also said she had no problems understanding her job when she worked (Tr. 64). Plaintiff has seven grown children and sixteen grandchildren (Tr. 56-57).

Thereafter, a vocational expert (VE) testified at the administrative hearing (Tr. 68). The ALJ stated that Plaintiff has past relevant work as an assembly line worker. The ALJ then propounded a hypothetical question, identifying a younger individual with a limited education, able to do first, second, and third grade work (Tr. 68). The individual would be limited to medium exertional work and restricted to simple routine tasks with SVP 1 to 2 (Tr. 69). The VE responded that the individual would be capable of performing Plaintiff's past relevant work as a light production assembler, SVP2 (*Id*.). The ALJ then added an additional limitation that the individual would be limited to occasional

5

interaction with the public and supervisors. The VE again testified that the individual would be capable of performing Plaintiff's past relevant work (*Id.*). The VE identified other jobs for such an individual, such as a warehouse worker, industrial cleaner, and floor waxer. He testified that the jobs have no more than occasional contact with co-workers and no contact with the public (Tr. 70). When asked by the ALJ to comment on acceptable tolerances by an employer, the VE testified that there is no acceptable level for unscheduled breaks. The VE further testified that, for entry-level work, if an employee is absent greater than one day a month, the individual would be unable to maintain employment (Tr. 71).

## V.     **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits and supplemental security income. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (Sections 20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (Sections 20 C.F.R. 404.1520(c)and 416.920(c)(1992);

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* Sections 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in Sections20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (Sections 20 C.F.R. 404.1520(d) and 416.920(d) (1992);

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (Sections 20 C.F.R. 404.1520(e) and 416.920(e) (1992);

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other

> factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (Sections 20 C.F.R. 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering her age, education, past work experience and residual functional capacity. *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI.    **STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. Section 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See, Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See, Walters v. Commissioner of Social Security,* 127 F.3d 525., 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See, id., Walters,* 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole.

*See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).

**VII.** **ANALYSIS**

Plaintiff asserts one issue:

A. WHETHER THE ALJ ERRED WHEN SHE FOUND THAT PLAINTIFF'S IMPAIRMENTS DID NOT MEET THE REQUIREMENTS OF LISTING 12.05C.

Plaintiff argues that she met the requirements of 20 C.F.R. Pt. 404, Subpt. P, App. 1, Section 12.05(C), the listing for mental retardation. In order for a claimant to meet a Listing, the claimant must prove that their impairment meets "all of the specified medical criteria" as an "impairment that manifests only some of those criteria, no matter how severely does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). *See*, 20 C.F.R. Section 404.1525(c)(d).

Listing 12.05C provides:

12.05 Mental Retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

12.05 The required level of severity for this disorder is met when the requirement in A, B, C, or D are satisfied.

12.05C A valid verbal, performance, or full scale IQ of sixty through seventy and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. Part 404, Subpart P, App. 1, Section 12.05(C).

In order to meet Listing 12.05(C)), a claimant must prove that she satisfies both the diagnostic description and the criteria set forth in subsection C (i.e, a valid verbal, performance, or full scale IQ of sixty through seventy and a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. Part 404, Subpart P, App. 1, Section

12.00(A). The diagnostic description for Listing 12.05C requires a claimant to exhibit a subaverage general intellectual functioning (*i.e.,* mental retardation); with deficits in adaptive function; initially manifesting during the developmental period (*i.e.*, before the age of twenty-two). 20 C.F.R. Part 404, Subpart P, App. 1, Section 12.05. Based upon substantial evidence, the ALJ correctly found that Plaintiff failed to satisfy both the diagnostic description and the criteria set forth in subsection C (Tr. 17).

Furthermore, Plaintiff did not exhibit the requisite subaverage general intellectual functioning. Consultative examining psychologist, Mark Hammerly, Ph.D., diagnosed Plaintiff with borderline intellectual functioning, not mental retardation (Tr. 324). Similarly, the ALJ found Plaintiff had a severe impairment of borderline intellectual functioning, not mental retardation (Tr. 14). Borderline intellectual functioning does not support the contention that a claimant satisfied Listing 12.05(C). *See, West v. Comm'r of Soc. Sec.*, 240 Fed. App'x. 692, 698-99 (6th Cir. 2007); *Justice v. Comm'r Soc. Sec.*, No. 12-3150, 2013 WL 645957, at *12-3 (6th Cir. Feb. 22, 2013). In addition, borderline intellectual functioning is not medically equivalent to mental retardation. A claimant's impairment is medically equivalent if "the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. Section 404.1526(a)(2). A diagnosis of borderline intellectual functioning "by definition excludes a diagnosis of mental retardation." *Williams v. Colvin*, No. 12-CV-11044, 2013 WL 686991, at *1 (E.D. Mich. Feb. 26, 2013).

Also, the ALJ correctly determined that Plaintiff did not satisfy her burden of proving that she exhibited deficits in adaptive functioning (Tr. 17). "Deficits in adaptive functioning" include lack of competence in areas such as social skills, communication, or daily living skills. *Heller v. Doe*, 509 U.S. 312, 329 (1993); *West*, 240 F. App'x at 698. The Court finds that substantial evidence supports the ALJ's findings that Plaintiff did not exhibit "marked" limitations in social skills, communication,

9

and daily living skills, but, rather, had only mild or moderate limitations in these areas (Tr. 16-17). The ALJ provided adequate analyses for why the evidence did not support marked limitations in these three functional areas (Tr. 16-17). In support of the ALJ's conclusions, state agency reviewing psychologists, Katherine Fernandez, Psy. D. and Roseann Umana, Ph.D., both opined that Plaintiff did not have any marked limitations in any of the three broad areas of functioning, and that she was capable of performing simple, unskilled work tasks (Tr. 93-94, 96-98, 120-121, 123-125). These opinions constitute evidence supporting the ALJ's decision. *See*, 20 C.F.R. Section 404.927(c)(2)(I); Social Security Ruling 96-6p, 1996 WL 374180, at *2.

Next, Plaintiff argues that she had deficits in adaptive functioning, based on her own testimony that she was held back in fourth or fifth grade, that she was unable to complete ninth grade, and that she had difficulty reading (Pl. Br. 10). She also cites a report from consultative examining physician, Dr. Hammerly, noting she was "barely competent," and had deficits in socialization, poor undeveloped social, a poor work history, and trouble holding a job (Pl. Br. 10). However, the ALJ correctly analyzed why this evidence failed to show deficits in adaptive functioning (Tr. 16-17, 19). Concerning Plaintiff's poor work history and trouble holding a job, the ALJ noted treatment records showed a lack of motivation to work, rather than an inability to work (Tr. 22). Plaintiff reported to treatment providers in October 2010 that her last job "didn't need me no more because I was always talking and not doing my work, goofing off, getting smart with the supervisor, telling him that he was not my boss and couldn't tell me what to do" (Tr. 22, citing Tr. 305). She stated that, "I just didn't want to be there," and that she had done a lot of call offs, no shows, arriving late, or leaving early "just because" (Tr. 22, citing Tr. 305). Furthermore, the ALJ noted that, despite Plaintiff's testimony regarding flunking a grade and that she only went to school through ninth grade, she was not in special education classes (Tr. 17, citing Tr. 62). As the Sixth Circuit has stated, "this Court has never held

10

that poor academic performance, in and of itself, is sufficient to warrant a finding of onset of subaverage intellectual functioning before age twenty-two." *Haves v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009).

Finally, Plaintiff's subaverage general intellectual functioning and deficits in adaptive functioning did not manifest during her developmental period (*i.e.*, before the age of twenty-two). *See, Turner v. Comm'r of Soc. Sec.*, 381 Fed. App'x, 448, 491-92 (6th Cir. 2010). Plaintiff did not sustain her burden of proof that she met step three of the sequential evaluation process, as the record does not disclose that Plaintiff's impairments manifested during her developmental period. *Bowen*, 482 U.S. at 146.

There was only one set of intelligence tests in the record – those administered by consultative examining psychiatrist, Dr. Hammerly, when Plaintiff was forty-five years old – verbal comprehension IQ of seventy, perceptual reasoning IQ of seventy-seven, working memory IQ of seventy-four, processing speed IQ of seventy-six, and full scale IQ of seventy (Tr. 323). Hence, the Court concludes that the ALJ correctly found the test results inconsistent with record evidence. *Albright v. Astrue*, No. 5:10-cv-2274, 2011 WL 4833125, at *11 (N.D. Ohio 2011). "In assessing the validity of a claimant's IQ, information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living, social functioning, concentration, persistence and pace; or ability to tolerate stress." *Albright*, 2011 WL 4833125 at *11.

The ALJ correctly found the test results inconsistent with the GAF score of fifty-four assigned by Dr. Hammerly. A GAF from fifty-one to sixty is indicative of "moderate" symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *See*, Amer. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000)

11

(DSM-IV-TR). Furthermore, the Sixth Circuit has also found a GAF score of fifty is consistent with the ability to work. *See, Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007). The ALJ also correctly found Plaintiff's activities of daily living did not support mental retardation, such as her ability to keep track of household expenses, obtain a driver's license, use public transportation, perform hobbies, and take her own medication (Tr. 19, citing Tr. 318-325).

Finally, Plaintiff argues that IQ test results at age forty-five should be extrapolated back in time to establish onset prior to age twenty-two (Pl. Br. 10). However, recent IQ test results are insufficient to prove deficits before age twenty-two. *See, Foster*, 279 F.3d at 355.

Although substantial evidence could support a decision either way, courts do not overturn an ALJ's decision based on that premise. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009).

## VIII. CONCLUSION

Based upon a review of the record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform her past relevant work as a factory worker, and, therefore, was not disabled. Hence, she is not entitled to DIB and SSI.

Dated: December 1, 2014  */s/George J. Limbert*
GEORGE J. LIMBERT
UNITED STATES MAGISTRATE JUDGE